**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

MANUEL DE JESUS C.S.,

             Petitioner,

        v.

THOMAS DECKER, et al.,

           Respondents.

_____

    Civil Action No. 20-5582 (ES)

        OPINION

SALAS, DISTRICT JUDGE

    Before the Court is petitioner Manuel De Jesus C.S.'s[1] ("Petitioner") amended petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, asking the Court to issue an Order requiring respondents William Barr, Thomas Decker, Ronald P. Edwards and Chad Wolf ("Respondents") to immediately release him from immigration detention due to the ongoing COVID-19 pandemic. (D.E. No. 9 ("Amended Petition" or "Am. Pet.")).  Also before the Court is Petitioner's emergent motion for a "Temporary Restraining Order," seeking the same relief on an expedited basis (D.E. No. 12 ("Motion")), which the Court construes as a motion for a preliminary injunction.[2]  The Court has reviewed the parties' submissions and decides this matter without oral argument.  *See*

---

[1]    Consistent with guidance regarding privacy concerns in social security and immigration cases by the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Petitioner is identified herein only by his first name and last initial.

[2]    Petitioner's Motion seeks extraordinary relief in the form of an order that Respondents immediately release him from custody.  (*See* D.E. No. 12-1).  While temporary restraining orders are "ordinarily aimed at temporarily preserving the status quo," Petitioner's requested relief here clearly "goes beyond preservation of the status quo and mandates affirmative relief."  *See Hope v. Warden York Cty. Prison*, 956 F.3d 156, 160 (3d Cir. 2020) (holding that an order releasing detainees from ICE custody constituted a preliminary injunction, not a temporary restraining order).

Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b).  For the reasons that follow, the Motion is GRANTED.

## I.     Background

### A.     Petitioner's Immigration and Criminal History

Petitioner is a native and citizen of Honduras who entered the United States near Brownsville, Texas on or about March 13, 2005.  (Am. Pet. ¶ 11; D.E. No. 17-6 at 1).  On September 12, 2005, an immigration judge ("IJ") in New York ordered Petitioner removed *in absentia* pursuant to Section 212(a)(6)(A)(i) of the Immigration Nationality Act ("INA"), as an alien present in the United States without being admitted or paroled.  (Am. Pet. ¶ 37; D.E. No. 17-6 at 1 & 3).  On April 16, 2013, Petitioner received relief under Deferred Action for Childhood Arrivals ("DACA"), which was subsequently extended twice but ultimately expired on May 14, 2019.  (Am. Pet. ¶ 42; D.E. No. 17-7 at 2).

It appears that Petitioner has no prior convictions or criminal record.  (Am. Pet. ¶ 16). However, on February 18, 2020, Petitioner was arrested and charged in New York with robbery in the second degree and criminal possession of stolen property in the fourth degree, apparently arising from two incidents involving purse snatching.  (D.E. No. 17-8 at 7–8; D.E. No. 17 ("Answer") at 7–8).  The state court judge released Petitioner on bail, and the criminal charges against him remain pending.  (Am. Pet. ¶ 16; D.E. No. 9-1, Declaration of Manuel De Jesus C.S. ("C.S. Decl.") ¶ 33).

On March 8, 2020, U.S. Immigration and Customs Enforcement ("ICE") arrested Petitioner outside of his residence.  (D.E. No. 17-7 at 2). Since that time, he has been detained at Hudson County Correctional Center ("HCCC") pursuant to INA § 236(a), 8 U.S.C. § 1231(a).  (Am. Pet. ¶ 34, Answer at 8).  On March 20, 2020, Petitioner filed a motion to reopen with Executive Office for Immigration Review, which was denied on June 10, 2020.  (Am. Pet. ¶ 38; D.E. No. 30-2 ¶ 5).

2

Counsel intends to file an appeal of that denial.  (*Id.*).  Petitioner also submitted a DACA renewal application, but it was denied on June 8, 2020 because he is in immigration custody.  (Am. Pet. ¶ 42; D.E. No. 30-2 ¶ 3).  Petitioner also filed a request with ICE for release on parole, which ICE denied on May 5, 2020.  (Am. Pet. ¶¶ 40 & 41; D.E. No. 17-9).

### B.    Petitioner's Underlying Medical Conditions

Petitioner asserts that he is at "high risk of severe complications of COVID-19" because he has been diagnosed with morbid obesity with a Body Mass Index ("BMI") of 40.1.  (Am. Pet. ¶ 17).  Petitioner points that according to the Centers for Disease Control and Prevention ("CDC"), severe obesity, defined as having a BMI of over 40, puts individuals at heightened risk complications of COVID-19.  (*Id.* (citing D.E. No. 9-2, Ex. E, *Groups at Higher Risk for Severe Illness*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html) (last visited May 15, 2020) (hereinafter "Groups at Higher Risk"))).[3]

Petitioner also alleges that his "medical records reveal that he has met the criteria for a diagnosis of hypertension on at least four occasions when his blood pressure was taken at HCCC."  (Am. Pet. ¶ 21).  To support this assertion, Petitioner relies on a declaration from Mariya Masyukova, MD, MS, a New York State licensed, board-certified family medicine physician, who based her conclusions on a review of Petitioner's medical records from HCCC and Richmond University Medical Center, where he was seen in the emergency room prior to his immigration detention.  (D.E. 9-4 Declaration by Dr. Mariya Masyukova, MD, MS ("Masyukova Decl.") ¶¶ 3 & 17).  Dr. Masyukova opines that based on Petitioner's blood pressure readings he meets the

---

[3]    The Court notes that the CDC's guidelines have been updated since the parties briefed this matter.  For instance, the CDC now lists individuals with obesity, defined as having a BMI of 30 or higher, as being at an increased risk of severe illness from COVID-19.  *People of Any Age with Underlying Medical Conditions: Obesity*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#obesity (last reviewed June 25, 2020).  The Court renders its decision based on the arguments and evidence in the record, but notes that this recent development does not seem to alter the Court's analysis.

criteria for a diagnosis of at a minimum stage 1 hypertension.  (*Id.* ¶ 5.a.).  According to Dr. Masyukova, the standard of care to fully examine and identify appropriate treatment for hypertension includes an electrocardiogram and numerous blood and metabolic tests as well as a urinalysis, which Petitioner has not received despite his high blood pressure readings.  (*Id.* ¶ 5.b.).

Petitioner also certifies that while in detention, he "has been having episodes of intense chest pains accompanied by numbness in [his] left arm, left hand and on the left side of [his] face. [He] sometimes also ha[s] difficulty breathing.  These episodes have been occurring about twice a week and generally last for a few hours."  (C.S. Decl. ¶ 11).  He further certifies that when he requests for medical assistance it usually takes an incredibly long time and multiple requests to be seen.  (*Id.* ¶ 12).  He alleges he has asked for medical assistance due to his chest pains and loss of feeling over 15 times since he was detained on March 8, 2020, but HCCC medical staff have seen him only twice for these conditions, and that was only after putting in repeated calls for help.  (*Id.*). In his supplemental declaration, Petitioner states that he makes the vast majority of his sick requests by verbally informing a corrections officer or nurse on his unit because he does not like to use the communal tablet which is not cleaned between each use.  (D.E. No. 30-1, Supplemental Declaration of Manuel De Jesus C.S. ("Suppl. C.S. Decl.") ¶¶ 9–15).  Petitioner had previously sought treatment for similar symptoms in October of 2019 from Richmond University Medical Center.  (C.S. Decl. ¶ 13).  He certifies that he does not remember if he was "given an exact diagnosis," but he knows that "the hospital doctors were concerned about [his] heart and chest and told [him] that [he] could have a heart attack or a stroke very easily."  (*Id.*).  When he told staff at HCCC about this medical history, they told him that he "should try to get [his] own medical records."  (*Id.*).  In response to the Court's June 2, 2020 Order (D.E. No. 21), Petitioner provided his records from Richmond University Medical Center, which confirm an elevated blood pressure

recording of 149/89 and a complete cardiac examination.  (D.E. No. 24-1 at 3).

In the Answer, Respondents do not dispute Petitioner is severely obese and, as stated by their own expert, that condition in and of itself puts him at higher risk for severe illness from COVID-19.  (D.E. No. 17-10, Declaration of Dr. Bartholomew F. Savino ("Savino Decl.") at 3).  Respondents do however challenge Petitioner's alleged diagnosis of hypertension and the possibility he suffered a heart attack in custody.  (Answer at 8–11).  During his medical evaluation at intake on March 8, 2020, Petitioner reported that he had no medical problems and was taking no prescribed medication.  (D.E. No. 7 at 37).  His blood pressure was recorded as 138/86.  (*Id.* at 16).  According to his HCCC medical records, on April 7, 2020, Petitioner was noted to have a complaint of intermittent anterior chest and back pains for one week.  (*Id.* at 70).  His blood pressure was recorded as 133/91.  (*Id.*)  After an examination, the provider concluded that because the pain in his chest was reproducible by palpation, it was "musculosketal" in nature and prescribed Petitioner Motrin.  (*Id.*).

His medical records also show that on April 9, 2020, Petitioner's vital signs were taken and recorded, including a blood pressure reading of 134/82.  (*Id.* at 69).  On April 22, 2020, Petitioner was seen for a follow up pertaining to his intermittent musculoskeletal chest pain.  (*Id.* at 67).  The provider recorded the following complaint from Petitioner: "[m]y hands get numb and tingling at times, my chest hurt at times, this is for long time now, I want a test like x-ray."  (*Id.*).  Petitioner indicated the pain was mid-chest.  (*Id.*).  After an examination, the provider diagnosed him with intermittent musculoskeletal chest pain with a possibility of paresthesia and continued his prescription for Motrin.  (*Id.*).  According to Respondents' medical expert, Dr. Savino, while Petitioner did have documented blood pressure readings near the threshold for a diagnosis of

5

hypertension,[4] those instances could be explained by secondary events and, in his opinion, Petitioner does not have hypertension. (Savino Decl. at 2).

In response to the Court's order, Respondents filed a supplemental response reflecting that Petitioner had consultations with a physician on March 8, 2020, April 7, 2020, April 9, 2020, April 22, 2020, and May 16, 2020. (D.E. No. 27-1, Supplemental Declaration of Warden Ron Edwards ("Suppl. Edwards Decl.") ¶ 7). Additionally, he had consultations with a nurse on April 2, 2020, April 25, 2020, and May 8, 2020. (*Id.*). HCCC's medical/sick call records show that Petitioner submitted requests for medical care via the tablet on March 13, 2020, April 22, 2020, May 7, 2020, and May 15, 2020. (*Id.*). Respondents do not provide any records for Petitioner's verbal sick calls, which they do not dispute.

### C.    Conditions at HCCC

According to the initial declaration provided by Edwards, HCCC can house a maximum of 1,400 inmates and 328 ICE detainees. (D.E. No. 17-5, Eighth Amended Declaration of Warden Ron Edwards ("Edwards Decl.") ¶ 3). HCCC's current inmate and detainee population is 687, of which 103 are ICE detainees. (*Id.*). Due to the COVID-19 crisis, each housing unit is on a "Restrictive Schedule." (*Id.* ¶ 11). Under the Restrictive Schedule, inmates and detainees are permitted out of their cells for two 30-minute periods during the day, and that this period is staggered. (*Id.* ¶¶ 11 & 12.k.).

The areas outside of the cells are being cleaned "continuously" during a 16-hour period throughout the day. (*Id.* ¶ 11). Additionally, inmates and detainees "may request disinfectant

---

[4]    Dr. Savino identifies that the threshold for a hypertension diagnosis is when a person's systolic blood pressure in the office or clinic is ≥140 mm Hg and/or their diastolic blood pressure is ≥90 mm Hg following repeated examination. (Savino Decl. at 2 (citing Thomas Unger, *et al.*, *2020 International Society of Hypertension Global Hypertension Practice Guidelines*, 75 Hypertension 1334–57 (2020) (hereinafter the "2020 Hypertension Guidelines")).

wipes from staff."[5]  (*Id.*).  Each housing unit is "locked down" between shifts to clean and sanitize.  (*Id.*)  All housing units are sanitized no less than three times per day.  (*Id.*).  Fresh air is constantly circulated by opening utilizing handler/vents throughout the day.  (*Id.* ¶ 12.e.).  All feeding is done inside the housing or cells and inmates do not congregate for meals.  (*Id.*)  HCCC provides disinfectant spray and soap in every housing unit at the jail.  (*Id.*).  Inmates and detainees are provided two bars of soap each and may obtain additional soap upon request.  (*Id.* ¶ 19).  Inmates and detainees have unlimited access to water.  (*Id.*).

The health care of inmates and detainees at HCCC is currently administered by Wellpath under the supervision of an on-site facility physician.  (*Id.* ¶ 7).  Due to the COVID-19 outbreak, additional Hudson County medical staff, including RNs and LPNs, are now on-site 24 hours a day, seven days a week, to provide full coverage for all detainee/inmate medical needs.  (*Id.*).  HCCC uses the multipurpose Universal Transport Medium ("UTM-RT") to test any detainees or inmates who require testing for COVID-19.  (*Id.* ¶ 15).  Particularly, HCCC has focused testing on individuals with symptoms consistent with a COVID-19 infection and first responders.  (*Id.* ¶ 24).  If an inmate or a detainee tests positive for COVID-19, but does not require hospitalization, the inmate or detainee will be isolated in a cell in a designated COVID-19 isolation area.  (*Id.* ¶ 15).  Symptomatic inmates and detainees awaiting test results are also placed in quarantine in medical, and stay there for 14 days.  (*Id.* ¶ 16).  Inmates and detainees who have had a known exposure to a person with confirmed COVID-19, but are asymptomatic, are cohorted together "with restricted movement for the duration of incubation period."  (*Id.* ¶ 17).

As especially relevant for Petitioner, inmate and detainees "with health conditions

---

[5]    The Court notes that later in his declaration, Edwards states that inmates and detainees "*are* provided disinfectant wipes." (Edwards Decl. ¶ 19) (emphasis added).  As discussed below, even crediting this more generous description of the policy regarding disinfectant wipes, the Court's conclusion regarding the conditions as applied to Petitioner does not change.

identified in the CDC guidelines as putting them at a high risk of developing serious illness or death from COVID-19, including . . . severe obesity," are "housed by themselves." (*Id.* ¶ 25). According to Edwards, correctional officers who work with those high-risk inmates and detainees are using full personal protective equipment ("PPE") including suits, N95 masks and gloves. (*Id.*). Additionally, the entire inmate and detainee population has been provided with surgical masks. (*Id.*). Despite these statements in his initial declaration, in response to the Court's order, Edwards acknowledges in his supplemental declaration that Petitioner is currently housed in a cell with one roommate to prevent loneliness, since Petitioner "has expressed concerns about his mental health." (Suppl. Edwards Decl. ¶ 4). Edwards also revised his statement regarding the use of PPE by correctional officers, now declaring that it is "HCCC policy" that all staff, including the staff in Petitioner's unit, don PPE while inside the facility, including N-95 masks, gloves, and eye protection. (*Id.* ¶ 6).

> As of 10:00 a.m. on May 25, 2020, HCCC identified the following cases of COVID-19, confirmed by testing, among HCCC inmates, detainees, and staff:
>
>> a. 17 ICE detainees have tested positive for COVID-19. There were no new positive test results since [the week of May 18th].
>>
>> b. 27 county and federal inmates have tested positive for COVID-19 There were no new positive test results since [the week of May 18th].
>>
>> c. 102 HCCC staff members have tested positive for COVID-19 since the outbreak began. There were 5 new positive test results since [the week of May 18th].

(Edwards Decl. ¶ 20). In addition, two members of the HCCC correctional staff, the former facilities commissary director, and two nurses who worked at HCCC have died from complications from COVID-19. (*Id.* ¶ 21). Since on or about April 27, 2020, HCCC has mandated that all law

enforcement officers be tested for COVID-19. (*Id.* ¶ 22). To date, all 350 of the officers have been tested, with 233 testing negative and 102 testing positive. (*Id.*). Of the 102 law enforcement officers who tested positive, 84 have recovered and returned to duty. (*Id.*).

The total number of inmates and detainees is currently 687. (*Id.* ¶ 23). 107 of the inmates and detainees have been tested, with 63 negative results. (*Id.*) Of the 44 inmates and detainees who tested positive for COVID-19, 43 have made a full recovery. (*Id.*).[6]

While not necessarily contradicting Edwards' statements, Petitioner's declarations identify gaps in protocols, and instances where HCCC policies are not being properly implemented or adhered to by correctional officers. Specifically, Petitioner states that he is not held in a high risk or isolation unit and has been in the same cell since he was brought to the facility. (C.S. Decl. ¶ 17). He states he is held in a two-person cell for 22 out of 24 hours a day and is let out in the morning for an hour and in the evening for an hour. (*Id.* ¶ 16). When he is out of his cell, Petitioner is with a group of approximately 5 to 8 other detainees. (*Id.* ¶ 18). The group size depends on whether there are one or two people in each two-person cell because the correctional officers usually let out four cells at a time, and sometimes a fifth cell is also let out. (*Id.*). While he is out of his cell, Petitioner needs to do various things such as use the phone to call his fiancée or attorney; use the microwaves to heat up food or water; and use the showers. (*Id.* ¶ 19). Petitioner heats up his water in the microwave in order to sanitize it because the water that comes out of the faucet in his cell is often dirty, and people in nearby cells have seen bugs crawling out of their faucets. (*Id.*). Petitioner tries to keep his distance from others, but for certain activities, such as using the phone, it is not possible. (*Id.* ¶ 20). This is because the phones are about one to two feet apart, meaning

---

[6] The Court recognizes this data is now over one month old. According to ICE's website, HCCC currently has five detainees who have COVID-19. *See ICE Guidance on COVID-19*, *ICE Detainees Statistics*, U.S. Immigration and Customs Enforcement, https://www.ice.gov/coronavirus (last updated June 29, 2020).

that if multiple detainees use the phones at the same time, they are close together.  (*Id.*).
Additionally, many people on his cell block use these phones throughout the day, but they are only
sanitized once a day and not between use.  (*Id.*).  Video conferencing also presents a risk because
those video conference phones are shared by Petitioner's block and another cell block, and the
room is regularly filled with trash and appears to be rarely cleaned.  (*Id.* ¶ 22).

No correctional staff at HCCC cleans Petitioner's cell block or his cell.  (*Id.* ¶ 23).
Petitioner can see common areas from his cell and states that he only sees the common area cleaned
once a day by inmate staff.  (*Id.*).  During the day, other detainees do their best to clean the common
area on their own, but they are not able to do so adequately.  (*Id.*).  Petitioner has never been
provided with disinfectant wipes or seen anyone else on his unit receive disinfectant wipes.  (*Id.*).
Petitioner has also never been given gloves.  (*Id.*).  The jail has given his unit one bottle of cleaning
liquid, one bottle of Windex and a box containing individual soap bars.  (*Id.* ¶ 24).  All these
supplies are kept near the correctional officers' station and are shared and touched by over 30
detained individuals, none of whom have gloves.  (*Id.*).

Petitioner states that in early May at least five people on his cell block had fevers.  (*Id.* ¶
26).  He alleges that people usually stay on his cell block until they have a confirmed positive test
of COVID-19.  (*Id.*).  He asserts that these tests are taking approximately one week to come back.
(*Id.*).  During the time they await test results, people with COVID-19 symptoms freely walk around
the cell block when out of their cells, coming into direct contact with others and using shared items
such as phones, showers, cleaning supplies, and the microwave.  (*Id.*).  On May 2, 2020, an
individual on Petitioner's unit was moved after he received a positive COVID-19 test.  (*Id.* ¶ 27).
The day before, that person had been walking around the common area freely during his time out
of his cell, coming into contact with others on the unit.  (*Id.*).  Even after the individual was

removed from the unit, his cellmate remained there and continued to use common areas. (*Id.*).

Petitioner has only been given three masks in the over two months that he has been detained. (*Id.* ¶ 15). On Petitioner's unit, correctional officers have at times worn masks, gloves or goggles but have never worn a full protective gear suit. (Suppl. C.S. Decl. ¶ 8). Correctional officers also do not consistently wear masks, gloves or goggles and recently have been wearing this protective gear less frequently. (*Id.*).

## II.    Jurisdiction

Pursuant to 28 U.S.C. § 2241(c), habeas relief may be extended to a prisoner when he "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3); *Maleng v. Cook*, 490 U.S. 488, 490 (1989). Here, Petitioner is currently detained in a locality within this Court's jurisdiction and by a custodian located within the Court's jurisdiction. The Amended Petition and application for a preliminary injunction assert that Petitioner's continued detention violates the Due Process Clause of the Fifth and Fourteenth Amendments to the Constitution. (*See generally* Am. Pet. ¶¶ 70–79 & 87–90). Thus, this Court has habeas jurisdiction. *See Spencer v. Kemna*, 523 U.S. 1, 7 (1998); *Braden v. 30th Judicial Circuit Court*, 410 U.S. 484, 494–95 (1973); *see also Zadvydas v. Davis*, 533 U.S. 678, 699 (2001).

Respondents argue that the Court lacks subject matter jurisdiction to consider Petitioner's claims under Section 2241. (Answer at 13–15). They further argue that, even if the Court does have habeas jurisdiction, release is not the proper remedy; instead, the remedy should be a change in the allegedly unconstitutional conditions. (*Id.* at 16–17). In support of this argument, Respondents accurately state that conditions of confinement claims, like the ones Petitioner asserts, are traditionally brought through a civil rights complaint pursuant to 42 U.S.C. § 1983. *See, e.g.*, *Camacho Lopez v. Lowe*, No. 20-0563, 2020 WL 1689874, at *4–6 (M.D. Pa. Apr. 7,

2020).  Conversely, challenges to "the fact or length of confinement" are properly brought in a habeas corpus petition.  *See Tedford v. Hepting*, 990 F.2d 745, 748 (3d Cir. 1993) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 494 (1973)).  Here, although Petitioner brings claims traditionally asserted through a civil rights complaint, he seeks immediate release from ICE custody, which is a remedy available through a habeas petition.  *See, e.g.*, *Preiser*, 411 U.S. at 494; *Leamer v. Fauver*, 288 F.3d 532, 540 (3d Cir. 2002); *Camacho Lopez*, No. 2020 WL 1689874, at *4 (citing *Preiser*, 411 U.S. at 500) ("When a petitioner seeks immediate release from custody, the 'sole federal remedy' lies in habeas corpus").

There is currently no Third Circuit or Supreme Court decision that directly addresses whether a conditions of confinement claim may be raised in a habeas corpus petition.  *See Camacho*, 2020 WL 1689874, at *5; *Jose S.J. v. Decker*, No. 20-6052, D.E. No. 32 at 8–18 (D.N.J. June 9, 2020); *see also Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 241–42 (3d Cir. 2005).  However, the Supreme Court has stated that "[w]hen a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making custody illegal."  *Preiser*, 411 U.S. at 499; *see also Ziglar v. Abbasi*, 137 S.Ct. 1843, 1862–63 (2017).  Similarly, the Third Circuit has alluded to the possibility of a "habeas attack on the conditions of confinement," which would be "cognizable in a federal habeas action only in extreme cases."  *Ali v. Gibson*, 572 F.2d 971, 975 n.8 (3d Cir. 1978).  Moreover, recent COVID-19 caselaw within this circuit has been largely consistent in finding that an immigration detainee may challenge the conditions of his confinement through a Section 2241 petition.  *See e.g.*, *Carmen R. v. Decker*, No. 20-3875, 2020 WL 2029337, at *12 (D.N.J. Apr. 28, 2020) (collecting cases); *Thakker v. Doll*, No. 20-480, 2020 WL 2025384, at *2 (M.D. Pa. Apr. 27, 2020) (collecting cases).  And many of these courts have found that release, via temporary

restraining orders or preliminary injunctions, was appropriate after determining that extraordinary circumstances exist due to the COVID-19 pandemic and the particular detainee's medical vulnerabilities and conditions of confinement. *See, e.g.*, *Jose M.C. v. Tsoukaris*, No. 20-6236, 2020 WL 3249097, at *5 (D.N.J. June 16, 2020) (collecting cases).

With these considerations in mind, the Court joins the line of cases that have permitted conditions of confinement claims to proceed through a habeas corpus petition and finds that Petitioner may pursue his due process claims through the instant Amended Petition.

## III.    Legal Standard

Injunctive relief is an "extraordinary remedy and should be granted only in limited circumstances." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). And "[a] party seeking a mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden in demonstrating its necessity." *Acierno v. New Castle Cty.*, 40 F.3d 645, 653 (3d Cir. 1994). The Court may grant an injunction only if a party shows: (i) a likelihood of success on the merits; (ii) that it will suffer irreparable harm if the injunction is denied; (iii) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (iv) that the public interest favors such relief. *Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 318–19 (3d Cir. 2015). A party must produce sufficient evidence of all four factors and the Court must weigh them prior to granting injunctive relief. *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994). However, "as a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *Id.* n. 8.

These first two factors are the "most critical." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). To meet the first factor, the petitioner need only "make a showing of

reasonable probability, not the certainty, of success on the merits." *SK & F, Co. v. Premo Pharm. Labs., Inc.*, 625 F.2d 1055, 1066 (3d Cir. 1980). Irreparable harm is "potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). Such loss must not be merely economic, but "of a peculiar nature, so that compensation in money cannot atone for it." *A.O. Smith Corp. v. F.T.C.*, 530 F.2d 515, 525 (3d Cir. 1976) (citation omitted). "If these gateway factors are met, a court then considers the remaining two factors." *Reilly*, 858 F.3d at 179.

Finally, the last two elements—balance of the equities and public interest—look at whether imposing the requested injunctive relief will result in a greater harm to the nonmoving party and whether granting the injunction is in the public interest. *See Pappan Enter., Inc. v. Hardees Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998). When the government is the party opposing a preliminary injunction, the balancing of the equities and public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

The Court also considers whether Petitioner has established extraordinary circumstances justifying his release. *See Lucas v. Hadden*, 790 F.2d 365, 367 (3d Cir. 1986); *Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992) (indicating that a court may only grant release pending a disposition of federal habeas claims when "the petitioner has raised substantial constitutional claims upon which he has a high probability of success, and . . . when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective") (citation omitted)); *see also In re Souels*, 688 F. App'x 134, 135-36 (3d Cir. 2017).

## IV.    Discussion

Petitioner asserts three claims, but at this juncture the Court will only address Petitioner's claim that his conditions of confinement amounts to punishment. As the Court outlines below, the

balance of the injunctive factors favors granting this particular Petitioner's requested relief. Moreover, Petitioner has also established extraordinary circumstances justifying his release.

### A.    Likelihood of Success on the Merits

Petitioner asserts that his continued detention amounts to unlawful punishment because "[t]he unsanitary and hazardous conditions at HCCC make it probable that he will be exposed to COVID-19," and that such exposure "is likely to cause him severe and potentially fatal consequences" in light of his medical vulnerability.  (D.E. No. 12-1 at 11; Am. Pet. ¶¶ 70, 74–78).

Immigration civil detainees are entitled to due process and may bring conditions of confinement claims under the Due Process Clause of the Fifth Amendment as opposed to the Eighth Amendment.  *See Bell v. Wolfish*, 441 U.S. 520, 535–36 (1979); *E.D. v. Sharkey*, 928 F.3d 299, 306–07 (3d Cir. 2019).  Under the Due Process Clause, "a detainee may not be punished prior to an adjudication of guilt."  *Sharkey*, 928 F.3d at 307 (quoting *Bell*, 441 U.S. at 535).  Thus, the Fifth Amendment protects detainees like Petitioner from any—not just "cruel and unusual"— punishment.  *See Hubbard v. Taylor*, 399 F.3d 150, 165–67 (3d Cir. 2005).

To determine whether Petitioner's conditions of confinement constitute punishment, the Court asks whether the challenged conditions are reasonably related to a legitimate governmental objective, and if they are not, the Court may infer "'that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees *qua* detainees.'"  *E.D.*, 928 F.3d at 307 (quoting *Hubbard*, 538 F.3d at 232).  A condition or deprivation amounts to punishment if there is "an expressed intent to punish on the part of detention facility officials"; no "alternative purpose to which [the condition or deprivation] may rationally be connected is assignable for it"; or the condition or deprivation is "excessive in relation to the alternative purpose assigned [to it]."  *See Bell*, 441 U.S. at 538 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144,

168–69 (1963)).  The Court considers "the totality of [the] circumstances within an institution" to determine whether given conditions constitute punishment.  *Hubbard*, 399 F.3d at 160 (internal quotation marks and citation omitted).

Over the past three months, courts throughout the country have faced a deluge of immigration detainee habeas petitions asserting similar claims.  Several courts have ordered the release of medically vulnerable detainees after finding both that (i) the particular facility had failed to take appropriate measures to protect the most vulnerable within their care from the likely adverse effects of COVID-19; and (ii) that the conditions of release could reasonably ensure that the detainee would not flee or present a danger to the community.  *See, e.g.*, *Reyes P. v. Edwards*, No. 20-3686, 2020 WL 2474423, at *6 (D.N.J. May 13, 2020) (collecting cases).  Several courts within this District—including this one—have concluded that in light of the ongoing pandemic and Respondents' failure to take appropriate precautions at HCCC, the conditions of confinement for certain medically vulnerable petitioners at HCCC amounts to unlawful punishment.  *See, e.g.*, *Marvin A.G. v. Decker*, No. 20-1689, D.E. No. 60, at 14 (D.N.J. June 26, 2020); *Thierry B. v. Decker*, No. 20-4035, 2020 WL 3074006, at *12 (D.N.J. June 10, 2020) (collecting cases).  Importantly, these decisions emphasize that "[e]ach individual case requires the careful weighing of the medical needs of the individual against the safety of the community and the enforcement of federal laws."  *See e.g.*, *Umarbaev v. Lowe*, No. 20-0413, 2020 WL 1814157, at *8 (M.D. Pa. Apr. 9, 2020); *id.* at *7 ("[H]abeas review is entirely individual."); *Thierry B.*, 2020 WL 3074006, at *16–18 (conducting individualized analysis for each named petitioner); *Thakker v. Doll*, No. 20-0480, 2020 WL 2025384, at *8 (M.D. Pa. Apr. 27, 2020) (recognizing that each petitioner presents an "unique set of circumstances" that must be balanced, and conducting individualized analysis for each petitioner).

Whether a particular medical condition renders an individual medically vulnerable to adverse effects from COVID-19 is a question that this Court is hardly equipped to determine without the benefit of considerable expert testimony. As such, many district courts, including this one, have turned to the guidance provided by the CDC to draw the initial line when adjudicating requests for temporary restraining orders and preliminary injunctions. *See, e.g.*, *Nohasses G. C. v. Decker*, No. 20-4653, 2020 WL 2507775, at *10 (D.N.J. May 15, 2020); *Jose M. C. v. Tsoukaris*, No. 20-6236, 2020 WL 3249097, at *7 (D.N.J. June 16, 2020) (collecting cases); *Barbecho v. Decker*, No. 20-2821, 2020 WL 1876328, at *2–3 (S.D.N.Y. Apr. 15, 2020); *Ramsundar v. Wolf*, No. 20-0361, 2020 WL 1809677, at *3 (W.D.N.Y. Apr. 9, 2020). Specifically, the CDC has identified certain groups of individuals who, according to recent research, are at high-risk for severe illness from COVID-19. *See* Groups at Higher Risk.

Here, it is undisputed that Petitioner is morbidly obese, and accordingly he falls within one of the groups identified by the CDC as being at a high risk for severe illness from COVID-19. (*See* Answer at 22). In fact, Edward's declaration plainly admits that HCCC uses the CDC's guidelines to draw the line. (*See, e.g.*, Edwards Decl. ¶ 25). Yet, Respondents attempt to discount the potential health risks Petitioner faces by citing to the declaration of Dr. Savino for the proposition that while Petitioner is severely obese, "his age of 24 and lack of other known contributing risk factors places him at an overall low probability for sustaining a cardiac event from coronary artery disease." (Savino Decl. at 3). But that Petitioner may have a low probability of sustaining a cardiac event does not necessarily negate the fact that his condition places him at a high risk for severe illness or death should he contract COVID-19. Indeed, the CDC specifically states that what places a severely obese individual at high risk is that the condition "increases the risk of a serious breathing problem called acute respiratory distress syndrome (ARDS), which is a

major complication of COVID-19 and can cause difficulties with a doctor's ability to provide respiratory support for seriously ill patients." *See* Groups at Higher Risk. Further, Dr. Masyukova points that "[e]ven in young people, severe obesity is associated with a three-fold increase in admission to critical care settings, and a seven-fold increase in intubation." (Masyukova Decl. ¶ 8). Respondents provide nothing to refute this evidence and the health risks Petitioner faces should he contract COVID-19.

Moreover, this record indicates that Petitioner has had several elevated blood pressure readings, both before and during his detention. (*See* D.E. Nos. 7 & 29-1). Dr. Masyukova opines that based on Petitioner's medical conditions and documented high blood pressure readings, Petitioner meets the criteria for a diagnosis of at least stage 1 hypertension. (Masyukova Decl. ¶ 5.a.). Dr. Masyukova points out that recent studies show that "patients with hypertension are more than three times more likely to die from COVID-19 than patients without hypertension." (*Id.* ¶ 8).

Respondents provide the declaration of Dr. Savino in response, who does not dispute that patients with hypertensions are at least three times more likely to die from COVID-19. (*See* Savino Decl.). Rather, Dr. Savino asserts that while there "are some documented elevated blood pressure readings[,] that does not make a diagnosis of hypertension." (Savino Decl. at 2). Particularly, Dr. Savino cites the 2020 Hypertension Guidelines, which recommend that hypertension "be diagnosed when a person's systolic blood pressure (SBP) in the office or clinic is ≥140 mm Hg and/or their diastolic blood pressure (DBP) is ≥90 mm Hg following repeated examination." (*Id.*). Dr. Savino discounts a hypertension diagnosis noting that Petitioner's "documented blood pressure recordings were rarely near those mentioned in the quoted [2020 Hypertension Guidelines]," and speculates, without providing any basis or citation to any evidence, that the elevated readings "could be secondary to some other physical or emotional stress" or due to Petitioner's hunger

strike.[7]  (*Id.*).  But as Dr. Masyukova points out in reply, those same 2020 Hypertension Guidelines "clearly state that two [elevated] measurements are sufficient [ ] to confirm [a hypertension] diagnosis."  (D.E. No. 20-1 ("Suppl. Masyukova Decl.")) at 1 ("Stated differently, persons with Hypertension can have normal range blood pressures at times, and continue to carry the diagnosis.")).  And this record indicates that Petitioner has had at least two qualifying elevated high blood pressure readings.  (*See* Masyukova Decl. 5.a.; D.E. No. 7; D.E. No. 29-1).

Furthermore, Dr. Masyukova opines, and Respondents do not contradict, that the standard of care for hypertension includes an electrocardiogram and various other tests.  (Masyukova Decl. 5.b.).  Indeed, Dr. Masyukova highlights that the same 2020 Hypertension Guidelines relied upon by Dr. Savino consider it essential for medical professionals diagnosing hypertension to "obtain a detailed history, [conduct a] physical exam, [conduct]  laboratory investigations, and [conduct an] electrocardiogram for all patients with elevated blood pressure."  (Suppl. Masyukova Decl. at 1).  Respondents concede that none of these diagnostic assessments have occurred despite Petitioner's high blood pressure readings, which Dr. Masyukova opines precludes "an appropriate diagnosis and risk assessment."  (*See id*.).  Further, Dr. Masyukova goes on to emphasize that the 2020 Hypertension Guidelines also "consider it essential to consider chest pain a 'symptom(s)/sign(s) of hypertension/coexistent illnesses' until proven otherwise."  (*Id.*; *see also id.* at 2 (listing chest pain and shortness of breath, among others, as "symptoms of hypertension/coexistent illness")).  Thus, Dr. Masyukova opines that at the very least:

> an electrocardiogram should have been done, if not after initial elevated blood pressures, then at least when [Petitioner] complained of ongoing chest pain.  *Not obtaining a complete investigation of chest pain constitutes a deviation from the minimal standards of clinical care.*  It is not sufficient to consider repeated chest pain non-

---

[7]      Notably, Petitioner's hunger strike occurred from April 25, 2020, to April 26, 2020, and both blood pressure readings on record for those days were 110/80, which fall within the normal range.  (*See* D.E. No. 7 at 64–65 & 75).  Thus, Dr. Savino's comments raise additional questions as to the veracity of his medical opinion.

cardiac without a more detailed investigation.

(Suppl. Masyukova Decl. at 1 (emphasis added)).  Respondents have failed to offer any evidence to contradict Dr. Masyukova's opinion in this respect.  As such, the Court finds that at best Respondents have failed to abide by the minimal standards of clinical care in the face of a potential hypertension diagnosis that, based on the undisputed record now before the Court, would further increase Petitioner's risk for severe illness if he contracts COVID-19.  (*See* Masyukova Decl. ¶ 8).

Still, Respondents maintain that HCCC has taken significant responsive action to address the spread of COVID-19 that sufficiently protect Petitioner, curing any constitutional concerns arising from Petitioner's conditions of confinement.  (Answer at 18–20).  This Court recently highlighted that while ICE and HCCC have taken a number of steps to help stop the spread of COVID-19 within HCCC, those steps contain several glaring deficiencies when applied to certain high-risk individuals such as Petitioner.  *Marvin A.G.*, D.E. No. 60, at 12–14.  Many of the concerns identified in *Marvin A.G.* are present in this record, and in fact, the record here appears to place this Petitioner at an even higher risk of exposure to COVID 19.

For instance, despite recognizing Petitioner's high-risk status, Respondents point only to a single protocol meant to specifically protect medically-vulnerable detainees like Petitioner: that such detainees are allegedly "housed by themselves" and that "correctional officers who work with those inmates and detainees are using full PPE including suits, N95 masks and gloves."  (Edwards Decl. ¶ 25).  But this record demonstrates that HCCC has not even properly followed that protocol with this Petitioner.  For instance, it is undisputed that Petitioner has been housed in the same general population unit, D300 West, since March 9, 2020, and that this unit contains a least 30 other detainees who share the same common areas.  (*See* C.S. Decl. ¶¶ 17 & 24; Suppl. Edwards

Decl. ¶ 2).[8]  Moreover, while Edwards originally declared that correctional officers attending to high-risk detainees wear "full PPE including suits, N95 masks and gloves," his new declaration retreats from that broad assertion.  (*Compare* Edwards Decl. ¶ 25, *with* Suppl. Edwards Decl. ¶ 6). Edwards's new declaration drops the claim that correctional officers wear "full PPE" like "suits" (*see* Suppl. Edwards Decl. ¶ 6), confirming Petitioner's claim that in his experience correctional officers have never worn such suits (*see* C.S. Decl. ¶ 28).  And instead of claiming that correctional officers wear the outlined PPE, Edwards now asserts only that it is "HCCC *policy* that all staff, including the staff in D300 West, don [PPE] while inside the facility, including N-95 masks, gloves, and eye protection."  (Suppl. Edwards Decl. ¶ 6 (emphasis added)).  Yet, Respondents fail to provide anything to contradict Petitioner's assertions that, alarmingly, correctional officers are not following that policy and "do not consistently wear masks, gloves or goggles and recently have been wearing this protective gear less frequently."  (Suppl. C.S. Decl. ¶ 8 (describing how on June 10, 2020, a lieutenant came to his cell block "without a mask, without gloves, and without goggles")).  Thus, these facts raise concerns that Petitioner is being placed at a high risk of exposure to COVID-19 from correctional officers coming into the facility and from other potentially contaminated detainees within his unit.

In effect, HCCC has provided Petitioner with no specific protections beyond those allegedly afforded to all non-high-risk detainees.  But this record suggests that even the protocols

---

[8]    Edwards's supplemental declaration also appears to backtrack from his original broad contention that all high-risk detainees are housed by themselves.  He now states that there are exceptions to this policy, and that Petitioner currently has a cellmate "to prevent loneliness" since Petitioner expressed concerns about his mental health and sought mental health counseling.  (Suppl. Edwards Decl. ¶ 4).  Petitioner's counsel appears to rely on the fact that Petitioner has a cellmate as further evidence supporting his claims.  (D.E. No. 30 at 2).  The Court does not agree.  The Court finds it somewhat concerning that Respondents do not point to any specific precautionary steps taken to reduce the risk that Petitioner will become infected with COVID-19 through his cellmate while sharing a 10' x 7' cell for at least 22 hours day, particularly because they are housed in a general population unit.  But at the same time, the Court would be hard pressed to blame Respondents for attempting to accommodate Petitioner's concerns about his mental health. Accordingly, the Court finds that the fact that Petitioner has a cellmate weighs neutrally for purposes of this motion, and the Court would not be inclined to find for Petitioner absent the deficiencies identified in this Opinion.

Respondents have allegedly implemented for the general detainee population are either not being properly followed with this Petitioner or are simply inadequate to protect this Petitioner given his medical vulnerability. For instance, Edwards asserts that detainees "who feel any symptoms of illness can make daily sick calls as needed; they can submit requests via tablet or to a nurse that comes in the unit twice a day." (Edwards Decl. ¶ 14). But this record undisputedly shows that Petitioner has made multiple sick calls—often complaining of difficulty breathing, chest pains, light-headedness, and numbness in his left arm and hand, and the left side of his face—that have gone unanswered for days and even weeks despite Petitioner's repeated requests. (*See* C.S. Decl. ¶¶ 11–12; Suppl. C.S. Decl. ¶¶ 11, 15–16; *see also, e.g.*, D.E. No. 27-3 (recording a sick call on March 13th, but for which there are no records of medical care); Suppl. Edwards Decl. ¶ 7 (confirming Petitioner received no medical attention between March 8th, when he arrived at HCCC, and April 7th)).[9] Further, Respondents are silent in the face of Petitioner's assertion that access to the communal tablet is only possible during the very limited time he is allowed out of the cell, and that the tablet is not cleaned between uses by multiple detainees. (Suppl. C.S. Decl. ¶¶ 9 & 13–14). As a result, Petitioner feels compelled to make the vast majority of his sick call requests by verbally informing a correctional officer or nurse. (*Id.* ¶ 15). And alarmingly, the record here suggests that Respondents have failed to even properly record Petitioner's verbal sick calls.

Moreover, Edwards asserts that HCCC provides disinfectant spray and soap in every housing unit at the jail. (Edwards Decl. ¶¶ 12.e. & 19). But Respondents do not dispute Petitioner's assertion that HCCC has only provided Petitioner's entire unit with just one bottle of

---

[9]    Further evidencing the lapse at HCCC to tend after Petitioner's medical needs, Petitioner describes how his prior cellmate "was openly bleeding in [their] cell because he had a burst cyst" for several days and HCCC "staff were slow to provide medical attention to him and his blood spread all over the cell." (C.S. Decl. ¶ 25). The Court finds it alarming that Respondents do not even attempt to dispute this incident at all.

cleaning liquid and one bottle of Windex, that the soaps are kept in a box near the correctional officers' station, and that all these supplies are kept in a common area and are shared and touched by over 30 other detainees who do not wear gloves. (C.S. Decl. ¶ 24). As a result, Petitioner states that he does not use these supplies because he is "worried about getting coronavirus by touching them," and instead he feels compelled to buy his "own soap from the jail commissary." (*Id.*).

Finally, although Respondents broadly assert that the "entire inmate and detainee population has been provided [with] surgical masks" (Edwards Decl. ¶ 25), Respondents do not even attempt to contradict Petitioner's allegations that these masks are rarely replaced. Indeed, Respondents do not dispute Petitioner's assertion that during the over two month period he has been detained at HCCC he has received just three disposable masks, and that he "only received more than one because [he] told staff that [he] didn't have one anymore because [his] mask was so dirty and worn that [he] had thrown it out." (C.S. Decl. ¶ 15).[10]

In short, on this record Petitioner has demonstrated that Respondents have failed to take enough steps to protect him in light of his medical vulnerabilities. While the Court acknowledges that ICE and HCCC have set out a number of policies and protocols to help stop the spread of COVID-19 within the facility, this record also supports the finding that Respondents are not in fact following many of these steps with regards to this particular Petitioner. As such, this Court concludes that these steps are insufficient to protect this particular high-risk individual. *See, e.g.*, *Marvin A.G.*, D.E. No. 60, at 13–14 (collecting cases).

Accordingly, the Court concludes that while Respondents have a legitimate purpose in

---

[10]    Edwards also asserts that all detainees in D300 West have tested negative for COVID-19. (Suppl. Edwards Decl ¶ 5). But Edwards has also stated that HCCC has focused its testing on detainees who present "symptoms consistent with a COVID-19 infection and first responders." (Edwards Decl ¶ 24). Additionally, he does not specify when those negative tests took place and Respondents do not appear to contradict Petitioner's statements that in recent weeks multiple detainees within D300 West have been transferred out of that unit after testing positive, even as other detainees they had contact with remain in the unit. (*See, e.g.*, C.S. Decl. ¶¶ 26–27). Thus, the vague comment that all detainees within that unit have tested negative does not change the Court's analysis.

detaining Petitioner, his detention is excessive given his medical vulnerabilities and Respondents' failure to take specific actions to protect Petitioner from contracting COVID-19.    Therefore, the Court finds that Petitioner has shown a substantial likelihood of success on the merits of his conditions of confinement due process claim.

### B.    Irreparable harm

Here, Petitioner meets the heighted standard for irreparable harm.  *Carmen R.*, 2020 WL 2029337, at *6 (noting that where a "Petitioner's request for a preliminary injunction would alter the status quo *pendente lite* until a decision on merits can be reached, Petitioner's burden to show that she will suffer an immediate irreparable injury is particularly high.").  As described above, Petitioner's severe obesity places him at a high risk of experiencing complications from COVID-19, such as ARDS, resulting in severe illness or death.  Further, it appears likely that Petitioner also suffers from hypertension, which on this record would indisputably further increase Petitioner's risk of dying from COVID-19 by more than three times.  (*See* Masyukova Decl. ¶ 8).  Thus, Petitioners' severe obesity, along with his likely undiagnosed hypertension and Respondents' failure to take appropriate precautions to protect him, places Petitioner at a substantial risk of suffering imminent irreparable harm if he contracts COVID-19 while in custody.

In their Answer, Respondents do not dispute that Petitioner is likely to suffer from these complications if he contracts COVID-19.  (*See* Answer at 25–26).  Rather, Respondents argue that Petitioner cannot demonstrate irreparable harm because he "has not explained how his home condition will be as safe, let alone safer, than HCCC" and he "has represented that he may have interactions with family members who have tested positive for COVID-19."  (*Id.* at 26).  But this argument conflates the irreparable harm analysis with the adequacy of the relief sought, and thus, fails to negate the fact that Petitioner is likely to suffer imminent and irreparable harm if he remains

at HCCC.[11]  Respondents also assert that Petitioner cannot demonstrate irreparable harm because he "is detained at a facility that is imposing strict measures to address the spread of COVID-19, and he has received thorough and careful treatment from the facility's trained medical staff."  (*Id.* at 26).  But this argument falls flat for the reason just outlined above.  Indeed, this record indicates that Petitioner is unable to take basic precautions against COVID-19 while at HCCC, such as wearing gloves, regularly replacing his masks, having access to disinfected common surfaces between uses, and remaining at a safe social distance from others.  Further, this record also suggests that far from providing Petitioner with "thorough and careful treatment from the facility's trained medical staff,"  Respondents have at best been dilatory when responding to Petitioner's numerous sick calls—many for potentially serious medical complaints such as chest pain, numbness in half of his body, and lightheadedness.  Thus, these undisputed allegations further compound the risk that Petitioner is likely to suffer severe consequences should he contract COVID-19 while at HCCC, since should Petitioner require emergency care—and the undisputed record here suggests that he likely would—Respondents are unlikely to timely respond.

Accordingly, on this record Petitioner has established a very real risk of imminent, serious, lasting illness or even death should he remain at HCCC.  "There can be no injury more irreparable." *See, e.g.*, *Thakker*, 2020 WL 1671563, at *4; *Kevin M. A. v. Decker*, No. 20-4593, 2020 WL 2092791, at *9 (D.N.J. May 1, 2020); *Rafael L.O. v. Tsoukaris*, No. 20-3481, 2020 WL 1808843, at *8  (D.N.J. Apr. 9, 2020).

### C.    Balancing of the Equities and the Public Interest

The remaining two factors require the Court to balance the relative harms and benefits to

---

[11]    Further, this argument completely mischaracterizes Petitioner's statement that if released he "would be able to talk to [his family members] on the phone more easily to check up on them" and he "might even be able to drop off some groceries outside their door or in another safe way."  (C.S. Decl. ¶ 9).  Indeed, Petitioner even specified that he "would not interact with them while they are sick or put [him]self or anyone else at risk of infection."  (*Id.*).

the parties and to the public flowing from the grant or denial of the requested relief. *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 595–6 (3d Cir. 2002). Because the government is the opposing party here, these two factors merge. *See Nken*, 556 U.S. at 435. The Court notes that Respondents have provided absolutely no argument or analysis on these two factors. Thus, the Court could interpret Respondents' silence as a concession that these last two factors cannot tip the balance in their favor.[12] Still, the Court provides a brief analysis in the interest of a more complete record.

Here, the potential injury to the Petitioner is serious due to his medical conditions and Respondents' failure to adequately tend to his medical needs. Indeed, this record suggests that Respondents have failed to take and follow through with many basic precautions to protect Petitioner despite conceding that he is at a high risk of suffering adverse consequences from COVID-19. Moreover, "the public has an interest in preventing the further spread of COVID-19" to ensure that limited health care resources are conserved. *See, e.g.*, *Rafael L.O.*, 2020 WL 1808843, at *9.

On the other hand, Respondents and the public have a legitimate interest in ensuring that detainees like Petitioner appear for immigration proceedings, do not abscond, or endanger the community pending their removal proceedings. *See, e.g.*, *Thierry B.*, 2020 WL 3074006, at *15. Petitioner appears to have significant ties to New York, where he has resided since the age of eight and has his family, including his fiancé and newborn daughter. (*See* Pet ¶ 77; Suppl. C.S. Decl. ¶¶ 2–4). Moreover, while Petitioner's two felony charges remain pending in New York state court, it does not appear that Petitioner has had any other encounters with the criminal justice system.

---

[12] The Court notes that Respondents have made it a practice to not brief these issues at all in many similar cases before the Undersigned. This is highly problematic, as this practice deprives the Court of a more complete record which may assist the Court not only in balancing the injunctive factors but in fashioning an appropriate remedy. The Court reminds counsel for Respondents that it is not the Court's job to make their arguments for them.

And importantly, Respondents have not put forth any argument or evidence to suggest that Petitioner's charges alone mean that there are no adequate conditions of release for this Petitioner or that otherwise the interest in continued detention outweighs the other injunctive factors. *Cf., e.g., Thierry B.*, 2020 WL 3074006, at *16 (denying release despite finding that petitioners met the threshold factors when the record demonstrated that the particular petitioner's criminal history of violent and serious sexual offenses outweighed the other injunctive factors).

Still, the circumstances surrounding these violent felony charges, which allegedly involved two purse snatching incidents that caused physical injuries to two elderly women, are very concerning and give this Court pause. (*See* Answer at 7). As such, the Court finds that the conditions proposed by Respondents are reasonable—albeit with certain modifications that will be outlined in the accompanying Order. (*See* D.E. No. 32). Petitioner argues that some of these limitations are too severe. (D.E. No. 33). But the Court notes that the critical argument on which Petitioner relies for his preliminary injunction is that he is particularly vulnerable to suffering severe illness or death from COVID-19. As such the Court concludes that in line with Petitioner's argument, the proposed conditions of release not only protect the public, but also protect Petitioner.[13]

In short, based on the instant record and the party's respective arguments, the Court finds that on balance the injunctive factors weigh in favor of granting temporary release to this Petitioner. Further, the Court also finds that in light of Petitioner's medical vulnerabilities, the high number of positive COVID-19 cases among staff, detainees, and inmates at HCCC, and the fact that HCCC has been described as being "at the epicenter of the outbreak," the Court concludes

---

[13]     Moreover, the Court notes that absent the unique circumstances at play, Petitioner's continue detention under Section 1231(a) would be presumably valid and he would not be entitled to even a bond hearing for at least three more months. *See Guerrero-Sanchez v. Warden York Cty. Prison*, 905 F.3d 208, 225–26 (3d Cir. 2018).

that Petitioner has also showed the necessary extraordinary circumstances warranting release on bail. *See, e.g.*, *Durel B. v. Decker*, No. 20-3430, 2020 WL 1922140, at \*10 (D.N.J. Apr. 21, 2020).

## V.     Conclusion

For the reasons discussed above, Petitioner's motion is GRANTED.  An appropriate order accompanies this Opinion.

*s/ Esther Salas*
**Esther Salas, U.S.D.J.**
